IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CRETE CARRIER CORP.,
   *Plaintiff*,

v().

SULLIVAN & SONS, INC. d/b/a
SULLIVAN'S GARAGE
   *Defendant*.

Civil Action No. ELH-21-328

**MEMORANDUM OPINION**

    This Memorandum resolves a motion for sanctions filed under Fed. R. Civ. P. 11 in an ongoing dispute between a long-haul trucking company, plaintiff Crete Carrier Corp. ("Crete"), and a towing and recovery company, defendant Sullivan & Sons, Inc. d/b/a Sullivan's Garage ("Sullivan"). The suit is rooted in an incident that occurred on August 28, 2020, when a 53-foot tractor-trailer (the "Vehicle") owned by Crete, carrying a load of cargo (the "Load"), was involved in a single-vehicle accident on Interstate 95 in Harford County, Maryland. The Vehicle could not be driven from the scene, and the Maryland State Police ("MSP") asked Sullivan to recover the Vehicle.

    Sullivan towed the Vehicle as well as the Load to its property, and subsequently sent an invoice (the "Invoice") to Crete for its services. Sullivan charged for its services by the pound, rather than on an hourly basis. Based on the allegedly excessive Invoice, Crete refused to pay Sullivan. In turn, Sullivan refused to release the Vehicle and the Load to Crete.

    At first glance, the foregoing allegations present a common billing dispute. But, on February 9, 2021, Crete filed a wide-ranging, eight-count complaint against Sullivan (ECF 1, the "Complaint"), alleging that Sullivan conspired with other towing companies in Maryland "to

charge for nonconsensual tows by the pound, not by the hour," in order to inflate the charges, *id.* ¶ 19, and asserting claims, *inter alia*, for antitrust violations and a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq*. In particular, the suit contains claims for replevin (Count I); injunctive relief (Count II); tortious interference with contract (Count III); tortious interference with economic and business relations (Count IV); conversion (Count V); violation of the Sherman Antitrust Act, 15 U.S.C. § 1 (Count VI); a RICO violation (Count VII); and violation of the Maryland Antitrust Act, Md. Code (2021 Repl. Vol.), § 11-204 of the Commercial Law Article (Count VIII). The Complaint is supported by two exhibits, which are docketed at ECF 1-2 and ECF 1-3.

Curiously, Sullivan never moved to dismiss any of the claims under Rule 12(b)(6). Instead, it answered the Complaint. ECF 6 (the "Answer").[1] But, it has since moved for sanctions, pursuant to Fed. R. Civ. P. 11. ECF 47. The motion is accompanied by a memorandum of law (ECF 47-1) (collectively, the "Motion") and two exhibits. ECF 47-2; ECF 47-3.

In the Motion, Sullivan contends that Count VI, Count VII, and Count VIII are frivolous and thus sanctionable. Defendant seeks a "restorative sanction," in the amount of $233.47, which reflects the amount that Sullivan paid its counsel to respond to these claims in the Answer. ECF 47-1 at 5. Sullivan also requests the imposition of punitive sanctions against Crete in the amount of $10,000. *Id.*

Pursuant to the Court's Order of January 19, 2022 (ECF 134), Crete responded to the Motion. ECF 154 (the "Opposition"). It is supported by numerous exhibits. Sullivan has not replied, and the time to do so has expired. *See* Local Rule 105.2(a).

---

[1] Sullivan also filed a "Counter-Complaint," asserting three counterclaims against Crete. ECF 11. Sullivan subsequently filed an Amended Answer, which includes the counterclaims. ECF 151. Crete has answered the counterclaims. ECF 155.

No hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

### I.     Factual and Procedural Background

#### A.

On August 28, 2020, "an employee and/or agent of Crete was operating [the Vehicle] transporting [the Load] from CG Sports in Lidnen, New Jersey to Variety Wholesale in Henderson, North Carolina . . . ." ECF 1, ¶ 8. While traveling south on I-95 near Joppa, Maryland, the Vehicle was involved in a single-vehicle accident. *Id.* ¶ 10. Thereafter, the MSP arrived at the scene for purposes of "investigat[ing] and assist[ing] with clearing the scene." *Id.* ¶ 11.

Crete avers that the MSP "maintains a list of towing companies that are authorized by the MSP to perform towing and recovery services at MSP's request." *Id.* ¶ 12. Such services are generally referred to as "'nonconsensual tows.'" *Id.* And, the MSP contacted Sullivan, a towing company on the MSP's list, to perform the towing and recovery services at issue. *Id.* ¶¶ 12-13.

According to Crete, the MSP "engaged Defendant to perform the towing and recovery services related to the Vehicle and the Load." *Id.* ¶ 14. Plaintiff asserts: "Neither Crete nor any of its employees or agents requested, engaged, and/or directed Defendant to perform any towing and recovery services following the Accident." *Id.* However, Sullivan contends that, at the scene, its agent contacted a Crete representative who authorized Sullivan to recover the Vehicle. *See* ECF 151, at 13-14, ¶¶ 31-32. Sullivan "remov[ed] the Vehicle and the Load from the roadway and transport[ed] the Vehicle and the Load to Defendant's tow yard." ECF 1, ¶ 15.

3

Plaintiff alleges that Sullivan originally charged approximately $142,000 for the cost of the towing and recovery. *Id.* ¶ 16; *see* ECF 1-2.[2] The charges were calculated, in part, based on the weight of the Vehicle and the Load. *See* ECF 1-2. However, Crete claims that, "[h]istorically, charges for towing and recovery services have been charged on an hourly basis based on the type of equipment necessary to perform the services." ECF 1, ¶ 17. Thus, plaintiff maintains that "charging services rendered by the pound[ ] conflicts with accepted and well-known industry standards." ECF 1, ¶ 18.

Further, Crete maintains that "in or about March 2020, Defendant and other towing companies on the MSP and other law enforcement agencies' lists improperly conspired and agreed to charge for nonconsensual tows by the pound, not by the hour, for the sole and improper purpose of artificially inflating the charges for services associated with nonconsensual tows." *Id.* ¶ 19. By way of example, Crete avers that "[l]ess than a year prior to the Accident, Defendant issued an invoice in the amount of $24,559.00 based on hourly billing for the same and/or similar services for a nonconsensual tow of a commercial vehicle as those that Defendant rendered following the Accident." *Id.* ¶ 21; *see* ECF 1-3. Accordingly, in plaintiff's view, "[t]he conspiracy and agreement between Defendant and its co-conspirators to fix prices has resulted in Defendant and its co-conspirators charging six times the accepted industry standard amount for their services." ECF 1, ¶ 21.

"Crete objected to the charges as unreasonable, excessive, and a deviation from accepted industry standards." *Id.* ¶ 22. And, Crete "demanded that Defendant release the Load and the

---

[2] With its "Counter-Complaint," Sullivan submitted a different version of the Invoice, which included an additional $69,000 for storage costs through March 10, 2021, at rates of $90 per day for the tractor and "roll debris" and $180 per day for the Vehicle's trailer. *See* ECF 11-1 at 3. In sum, Sullivan charged Crete a total of $211,455.00 for its services. *Id.*

Vehicle to Crete and that Defendant cease assessment of any additional storage and/or other charges." *Id.*

Nonetheless, Sullivan "refused to return the Vehicle and the Load to Crete and continued to assess storage charges associated with [its] retention of Crete's property, advising Crete that [it] would not return the Vehicle and the Load until Crete paid the full amount of the Invoice." *Id.* ¶ 23. Crete again "objected to the Invoice, continued assessment of storage charges, and Defendant's continued detention of the Load and the Vehicle." *Id.* ¶ 24. Still, Sullivan "refused to release the Load and Vehicle" until Crete paid the Invoice. *Id.*

This suit followed.

**B.**

As mentioned, the case would appear to involve a somewhat ordinary billing dispute. But, in addition to a challenge to Sullivan's entitlement to recover the monies that Sullivan claims is due and owing, Crete has leveled serious claims against Sullivan: violations of Section 1 of the Sherman Antitrust Act (Count VI); RICO (Count VII); and the Maryland Antitrust Act (Count VIII).

With respect to the State and federal antitrust claims, plaintiff alleges: "Defendant along with other towing companies on the MSP approved towing list, engaged in a contract, combination, and/or conspiracy to deviate from industry standard billing practices and to begin charging for nonconsensual tows of commercial vehicles on a per pound basis for the sole purpose of artificially inflating invoices . . . ." *Id.* ¶¶ 61, 78. As a result, "[t]he contract, combination and/or conspiracy in which Defendant engaged imposed an unreasonable restraint on trade in that it prohibits competition in pricing and quality of services for nonconsensual towing of commercial motor vehicles." *Id.* ¶¶ 63, 80. Further, Crete claims: "There is no appropriate or legitimate business

5

justification for Defendant to force motor carriers to pay for nonconsensual towing and recovery services on a per pound basis . . ., as this manner of billing bears absolutely no relationship to the actual type or amount of work and/or services provided." *Id.* ¶¶ 64, 82.  And, Crete contends that it "was, and continues to be, injured by being forced to pay . . . an excessive and unreasonable sum that bears no relationship to the nature and scope of work performed by Defendant in order to secure the release of the Vehicle and the Load." *Id.* ¶¶ 66, 83.

As to Crete's RICO claim, the Complaint avers that defendant "knowingly and willfully conducted and/or participated directly and indirectly in a pattern of racketeering activity . . . ." *Id.* ¶ 72.  Plaintiff states: Sullivan "extort[ed] and/or attempt[ed] to extort motor carriers by illegally and improperly holding property under threat of economic harm unless and until Defendant receives payment of money in amounts to which Defendant is not entitled . . . ." *Id.* ¶ 73.  And, in Crete's view, "Defendant's predicate acts are part of a scheme and are not isolated events," but part of a "pattern of racketeering activity [that] is ongoing and amounts to or poses a threat of continued criminal activity." *Id.* ¶ 74.

## C.

In earlier stages of litigation, Crete sought an expedited hearing with respect to its request for replevin as to the Vehicle and the Load (ECF 17), which the Court held on May 28, 2021.  *See* ECF 36.[3]  And, on June 30, 2021, the Court issued a Memorandum Opinion (ECF 45) and Order (ECF 46), granting plaintiff the requested writ.  Notably, in resolving this dispute, I observed in a footnote, ECF 45 at 2 n.1:

> Although not directly pertinent for present purposes, the RICO and Sherman Act claims seem to be heavy artillery for this dispute—akin to bringing a

---

[3] Due to the COVID-19 pandemic, the hearing was held via video.  Notably, the Docket inaccurately reflects that the hearing was held on Crete's motion to dismiss Sullivan's "Counter-Complaint."  ECF 36.

gun to a knife fight. However, no challenge was lodged by Sullivan as to the basis for a RICO or Sherman Act claim. Nonetheless, I remind counsel of the provisions of Fed. R. Civ. P. 11.

Apparently, Sullivan was inspired by the Court's remark. It filed the Motion twenty-one days later, on July 21, 2021. ECF 47.

## II. Standard of Review

Under Rule 11 (b) of the Federal Rules of Civil Procedure, an attorney or self-represented party presenting any document to the Court must certify that to the best of his or her "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances":

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

A lawyer violates Rule 11 when, "'applying a standard of objective reasonableness, it can be said that a reasonable attorney in like circumstances could not have believed his actions to be legally justified.'" *Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006) (quoting *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 153 (4th Cir. 2002)). And, factual allegations "fail to satisfy Rule 11(b)(3) when they are 'unsupported by any information obtained prior to filing.'" *Morris*, 448 F.3d at 277 (quoting *Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991)).

Rule 11(c)(2) permits a court to impose sanctions for violations of Rule 11. Such sanctions may include "nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4).

The "primary purpose of Rule 11 is to punish violators and deter parties and their counsel from pursuing unnecessary or unmeritorious litigation." *Moody v. Arc of Howard Cty., Inc.*, 474 F. App'x 947, 950 (4th Cir. 2012). Thus, "an isolated, inadvertent error does not justify Rule 11 sanctions." *In re Bees*, 562 F.3d 284, 288 (4th Cir. 2009).

The decision to issue Rule 11 sanctions is within the court's discretion. *DeBauche v. Trani*, 191 F.3d 499, 512 (4th Cir. 1999). But, sanctions should be imposed "sparingly." *Jacobs v. Venali, Inc.*, 596 F. Supp. 2d 906, 914 n.10 (D. Md. 2009).

Pursuant to Rule 11(c)(2), a motion for sanctions must be served upon the opposing party, "but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." In other words, Rule 11's "safe harbor" provision requires the party seeking sanctions to provide his adversary with notice and an opportunity to withdraw the offensive pleading prior to filing a motion for sanctions with the court. *See Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 388–89 (4th Cir. 2004). If this requirement is not satisfied, "the district court lacks authority to impose the requested sanctions." *Id.* at 389.

### III. Discussion

**A.**

As noted, the Motion was filed twenty-one days after the Court issued its Memorandum Opinion of June 30, 2021, in which I "remind[ed] counsel of the provisions of Fed. R. Civ. P. 11." ECF 45 at 2 n.1.  But,  there is no indication in the Motion, the supporting exhibits, or any other filing from Sullivan that Sullivan served the Motion on Crete before filing it, or that twenty-one days elapsed between the time Sullivan served the Motion on Crete and filed it with the Court.  To the contrary, the certificate of service attached to the Motion indicates that the Motion was served on Crete on July 21, 2021, the same day Sullivan filed the Motion with the Court.  *See* ECF 47 at 6.  And, "[p]resumably," if Sullivan "had complied with [Rule 11(c)(2)]" it "would have indicated as such."  *Echevverria v. Samuel I. White, P.C.*, 1:18-cv-30 (TSE/TCB), 2019 WL 1375587, at *3 (E.D. Va. Feb. 12, 2019) (citing *Dye v. SD Trust Wells Fargo Funds Mgmt. Branch*, No. 3:16-cv-00681-MOC, 2016 WL 6780345, at *1 (W.D.N.C. Nov. 15, 2016)).

The safe harbor period "begins to run only upon service of [the proposed Rule 11 motion]" upon the party against whom sanctions are sought.  *See* Fed. R. Civ. P. 11 advisory committee notes (1993).  Moreover, informal notice of a potential Rule 11 violation is "insufficient to trigger the beginning of the twenty-one day period."  5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, Civil § 1337.2 (4th ed. Apr. 2021).  Thus, the Court's expression of concern has no bearing on whether Sullivan satisfied the safe harbor provision of Rule 11.

Accordingly, on its face, Sullivan's failure to evidence its compliance with the safe harbor provision required by Rule 11 strips the Court of its "authority to impose the requested sanctions."[ ]  *Brickwood Contractors, Inc.*, 359 F.3d at 389.

9

However, Crete did not invoke the safe harbor defense in its Opposition. *See* ECF 154. And, the safe harbor defense is not a limitation on the Court's jurisdiction. Thus, it is subject to waiver. *See Rector v. Approved Fed. Sav. Bank*, 265 F.3d 248, 252 (4th Cir. 2001). As the *Rector* Court explained, *id.*: "[A] movant filing under Rule 11 must serve the motion at least 21 days before filing it with the court. If the movant files the motion less than 21 days after giving notice, the party against whom the motion is filed may assert the 21 day safe harbor provision as a defense. Should the litigant fail to do so, the defense is waived."

Because Crete did not invoke the safe harbor provision in its Opposition, Sullivan's failure to adhere to the procedural requirements of Rule 11 does not end the Court's inquiry. *See Wilhelm v. Wilhelm*, WDQ-09-1713, 2010 WL 2640113, at *2 n.5 (D. Md. Jun. 28, 2010) (noting that the non-moving party "waived the safe harbor defense by failing to raise it in his opposition"); *Bose v. Jews*, WDQ-09-3400, 2010 WL 2427435, at *1 n.2 (D. Md. Jun. 11, 2010) (same).

I turn to the merits of the Motion.

**B.**

Sullivan argues that the Court should sanction Crete for asserting frivolous, groundless antitrust and RICO claims. In its view, the factual contentions underlying these claims "'are clearly baseless'" and are "'the product of delusion or fantasy . . . .'" ECF 47-1 at 1 (quoting *Neitze v. Williams*, 491 U.S. 319, 327 (1989)).

With respect to the alleged antitrust violations, Sullivan contends: "There is no evidentiary support for any of [plaintiff's] allegations. No . . . agreement had been ever been made between Sullivan & Sons, Inc., and any other persons, natural or juridical." ECF 47-1 at 2; *see id.* at 4 (stating the same as to plaintiff's claim under the Maryland Antitrust Act). Sullivan adds, *id.* at 2:

10

"No facts have been alleged as to time, date, or participants, as to this alleged action." Likewise, Sullivan maintains there is no evidentiary support for plaintiff's RICO claim. *Id.* at 3.

In an attempt to bolster it contentions, Sullivan submitted an affidavit from its President, Wayne Sullivan, Sr. ("Mr. Sullivan"). ECF 47-2. Notably, he states that defendant has never "had any conspiracy, agreement, or even a discussion regarding, nor presented any statement to, any other towing companies on the MSP approved towing list, or any other tow company . . . ." *Id.* at 3. Further, he declared, "to a degree of absolute certainty, that there have been no communications between Sullivan & Sons, Inc. and any other tow company regarding billing on a per pound basis as alleged in Crete's complaint." *Id.* at 4.

In response, Crete asserts that, prior to filing the Complaint, counsel "conducted an investigation into the issue of non-consensual towing and the use of per pound billing after receipt of the Subject Invoice and prior to the filing of the Complaint." ECF 154 at 7-8. In particular, counsel states that she spoke with two colleagues who had "dealt with **two separate MSP approved towing companies**, with both colleagues conducting factual investigations surrounding the representation of other trucking companies, which, upon information and belief, revealed collusion was occurring between and among the MSP approved towing companies to change the industry standard for pricing of commercial motor vehicle recovery services." *Id.* at 8 (emphasis in original). In particular, a colleague who works with plaintiff's counsel indicated that an official employed by another MSP approved tow company "advised the colleague that MSP approved tow companies all agreed to charge the same amounts in counties where there are no set rates to establish the industry standard." *Id.* at 6. (internal quotation marks omitted).

Additionally, plaintiff states: "[D]uring the fall of 2020, the Maryland Motor Truck Association ('MMTA') received several complaints from its members (trucking companies) about

11

excessive tow bills." *Id.* And, upon the MMTA's "own independent investigation, including the formation of a towing work group to discuss these issues, [it] and [the] Owner-Operator Independent Drivers Association ('OOIDA'), endorsed and sent a letter to the MSP regarding 'Issues Concerning Nonconsensual Tows in Maryland' on October 15, 2020 . . . ." *Id.*; *see* ECF 154-2 (the "Letter"). Indeed, the "Letter contained four instances of three separate MSP approved towing companies, including [Sullivan] and the Subject Invoice, charging MMTA/OOIDA members by the pound for commercial motor vehicle recovery services and included a prior invoice from [Sullivan] in 2019 where an hourly charge was used as opposed to a per pound charge." ECF 154 at 7; *see* ECF 154-2 at 2.

Further, plaintiff avers that its allegations have been borne out by the evidence uncovered in discovery. *See* ECF 154 at 9-15. In particular, plaintiff directs the Court's attention to the deposition testimony of a Sullivan official, Wayne G. Sullivan, Jr. ("Sullivan, Jr."). In his testimony, Sullivan, Jr. conceded that he had conversations with officials employed by other MSP approved towing companies, in which he discussed "[w]hether or not [per-pound billing] was easier [or] simpler" and if "it help[ed] them out on getting the transaction between the customer or the insurance company . . . ." ECF 154-5 at 20 (Tr. at 73). Thus, in plaintiff's view Sullivan, Jr.'s testimony undercut the forthright denials that no such conversations occurred, as set forth in the sworn declaration of Mr. Sullivan. *Id.* at 10-12; *see* ECF 47-2 at 3-4.

Moreover, in the deposition testimony of Mr. Sullivan, he affirmed that, with respect to "police-initiated tows," it was defendant's practice to "h[o]ld onto a commercial motor vehicle . . . until its invoice was paid." ECF 154-6 at 2 (Tr. at 138). Thus, Crete maintains that it has uncovered evidence of "a pattern and practice by Sullivan's on non-consensual tows only, of

extorting and/or attempting to extort motor carriers by illegally and improperly holding property under threat of economic hardship until payment is received." ECF 154 at 14.

As indicated, Sullivan has not responded to the Opposition.

To be sanctionable, a legal position "must have absolutely no chance of success." *Hunter*, 281 F.3d at 153 (internal quotation marks and citations omitted). And, the Fourth Circuit has recognized that "'[c]reative claims, coupled even with ambiguous or inconsequential facts, may merit dismissal, but not punishment.'" *Id.* (*quoting Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991) (alteration in *Hunter*). To determine whether including Counts VI through VIII was sanctionable conduct, I must consider the requisite elements of a claims arising under RICO as well as the federal and State antitrust laws.

With respect to plaintiff's antitrust claims, Section 1 of the Sherman Antitrust Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1. So, "[t]o establish a § 1 antitrust violation, a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423-24 (4th Cir. 2015) (quotation marks and citation omitted). However, "Section 1 applies only to concerted action that restrains trade." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). In other words, plaintiff's allegations, taken as true, must tend to show that "'the [alleged conspirators] had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Albert v. Global Tel*Link Corp.*, LKG-20-1936, 2021 WL 4478696, at *6 (D. Md. Sept. 30, 2021) (quoting *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 820 (D. Md. 2013) (alteration in *In re Titanium Dioxide*)).

Consequently, "an antitrust conspiracy does not exist where there is 'nothing beyond parallel conduct.'" *Rojas v. Delta Airlines, Inc.*, 425 F Supp. 3d 524, 543 (D. Md. 2019) (quoting *Bell Atlantic Corp*. v. *Twombly*, 550 U.S. 544, 554 (2007)). But, a complaint states a plausible claim for a Section 1 violation where "plaintiff provides 'plus factors' that suggest the 'parallel behavior would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties' or alleges 'further circumstances pointing toward a meeting of the minds.'" *Rojas*, 425 F. Supp. 3d at 543 (quoting *SD3, LLC*, 801 F.3d at 424, 430).

As to the Maryland Antitrust Act, it "'is essentially the same as § 1 of the Sherman Antitrust Act.'" *Krause Marine Towing Corp. v. Ass'n of Md. Pilots*, 205 Md. App. 194, 209, 44 A.3d 1043, 1053 (2012) (quoting *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 53, 485 A.2d 663, 666 (1984)). Further, "[d]ecisions of federal courts interpreting the Sherman Antitrust Act" guide the analysis of a claim brought pursuant to the Maryland Antitrust Act. *Krause Maine Towing Corp.*, 205 Md. App. at 209, 44 A.3d at 1053.

Congress enacted RICO as Title IX of the Organized Crime Control Act of 1970, Pub. L. No. 91–452, 84 Stat. 922 (1970). *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997). RICO prohibits various activities generally associated with organized crime. *See* 18 U.S.C. §§ 1963, 1964.

Under 18 U.S.C. § 1962, it is unlawful, *inter alia*, for any person employed by or associated with any enterprise to conduct or participate in the "enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). In addition to criminal penalties, Congress "granted a private civil right of action to '[a]ny person injured in his business or property by reason of a violation of' the RICO provisions." *ESAB Grp.*, 126 F.3d at 626 (citing 18 U.S.C. § 1964(c)).

14

A civil RICO action "'is a unique cause of action that is concerned with eradicating organized, long term, habitual criminal activity.'" *U.S. Airline Pilots Ass'n v. Awappa, LLC,* 615 F.3d 312, 317 (4th Cir. 2010) (citation omitted); *see, e.g.*, *Lewis v. Maryland*, PWG-17-1636, 2018 WL 1425977, at *5 (D. Md. Mar. 22, 2018); *Bailey v. Atlantic Auto. Corp.*, 992 F. Supp. 2d 560, 578 (D. Md. 2014). But, the Fourth Circuit "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988).

To plead a civil RICO claim, a plaintiff must allege "'1) conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity.'" *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989) (citation omitted); *see also, e.g.*, *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000); *Bhari Info. Tech. Sys. Private Ltd. v. Sriram*, 984 F. Supp. 2d 498, 503 (D. Md. 2013). A plaintiff must also allege injury to "his business or property." *Morley*, 888 F.2d at 1009 (quoting 18 U.S.C. § 1964(c)).

To be sure, Congress has directed that the statute "be liberally construed to effectuate its remedial purposes." Pub. L. 91–452, § 904(a), 84 Stat. 941, 947. But, "Congress contemplated that only a party engaging in widespread fraud would be subject to" the "serious consequences" available under the RICO statute, such as treble damages. *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989).

The Fourth Circuit has noted the "distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *El-Shamari*, 217 F.3d at 238. It has admonished that courts must

> exercise caution "to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the

15

multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted."

*Awappa*, 615 F.3d at 317 (quoting *Menasco, Inc.*, 886 F.2d at 683) (ellipsis in *Awappa*). In other words, RICO "is not a cause of action to be pled lightly," and "'RICO treatment is reserved for conduct whose scope and persistence pose a special threat to social well-being.'" *Biggs v. Eaglewood Mortg., LLC*, 582 F. Supp. 2d 707, 714 (D. Md. 2008) (quoting *Ge Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 551 (4th Cir. 2001)), *aff'd*, 353 F. App'x 864 (4th Cir. 2009).

In order to analyze the adequacy of a RICO claim, it is important to understand RICO's terms and concepts.

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). *See, e.g.*, *Boyle v. United States*, 556 U.S. 938, 944 (2009); *Kimberlin v. Nat'l Bloggers Club*, GJH-13-3059, 2015 WL 1242763, at *3 (D. Md. Mar. 17, 2015). However, "'[v]ague allegations of a RICO enterprise . . . lacking any distinct existence and structure' will not survive dismissal." *Mitchell Tracey v. First American Title Ins. Co.*, 935 F. Supp. 2d 826, 843 (D. Md. 2013) (citation omitted; modifications in *Mitchell Tracey*).

In *Mitchell Tracey*, the court explained, *id.* at 842:

> An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477-78 (D. Md. 2009). "[A]n associated-in-fact enterprise is one type of enterprise defined in § 1961(4)." *United States v. Tillett*, 763 F.2d 628, 631 n.2 (4th Cir. 1985). To satisfy § 1962(c)'s "distinctiveness" requirement, the Plaintiffs must further allege that the RICO "enterprise" is distinct from the defendant "person" alleged to have violated RICO. *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 457 (E.D. Pa. 2010); *Toucheque v. Price Bros. Co.*, 5 F. Supp. 2d 341, 346-47 (D. Md. 1998).

16

"Racketeering activity" is defined in § 1961(1)(B) to include a laundry list of "indictable" acts, such as mail fraud, wire fraud, financial institution fraud, among many other crimes. "To allege a pattern of racketeering activity, a plaintiff must present facts making it plausible, rather than possible, that: (1) at least two predicate acts occurred within ten years of each other; (2) the predicate acts were related; and (3) the acts 'amount to or pose a threat of continued criminal activity.'" *Swarey v. Desert Capital REIT, Inc.*, DKC-11-3615, 2012 WL 4208057, at *12 (D. Md. Sept. 20, 2012) (quoting *H.J. Inc.*, v. *Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989)).

Notably, "RICO is not 'aimed at the isolated offender.'" *International Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987) (quoting *Sedima S.P.R.L., v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14 (1985)). Therefore, "[t]he pattern requirement was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes." *Lipin Enters. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986). A "pattern of racketeering activity" requires "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). To prove a pattern, a plaintiff is required to show that the predicate acts "are [1] related *and* [2] that they amount to or pose a threat of *continued* criminal activity." *H.J. Inc.*, 492 U.S. at 239 (first emphasis in original; second emphasis added).

The Complaint is virtually devoid of any facts concerning Sullivan's alleged antitrust and racketeering activity. As a result, the Complaint may have been vulnerable to a challenge to its legal sufficiency under Fed. R. Civ. P. 12(b)(6). But, as indicated, Sullivan failed to lodge a Rule 12(b)(6) challenge to Crete's antitrust and RICO claims.

Despite the dearth of facts in the suit, Crete now indicates that it conducted a pre-filing investigation and discovered information indicating that towing companies, including Sullivan, had worked in tandem to institute a per-pound billing system for the delivery of nonconsensual towing services in Maryland, so as to inflate the fees. ECF 154 at 5-7. And, Crete's counsel was given reason to believe that this parallel conduct was the result of a furtive agreement between a large number of towing companies. *Id.* at 8. Moreover, since suit was filed, Crete claims to have uncovered evidence in discovery that undermines the unqualified statements of Mr. Sullivan, asserting that no Sullivan officials had ever engaged in any discussion with another MSP approved tow company pertaining to billing on a per-pound basis. *Compare* ECF 154-5 (Sullivan Jr. Dep.) at 20 (Tr. at 73-74) *with* ECF 47-2 (Mr. Sullivan Decl.) at 3-4.

Thus, despite any earlier pleading deficiencies, it may be that Crete has garnered facts to support its claims. Even if dismissal of these claims would have been appropriate under Rule 12(b)(6), it does not necessarily follow that the inclusion of the claims in the Complaint calls for sanctions, given the current posture. *Cf. United Specialty Insur. Co. v. Dorn Homes Incorp.*, CV-18-08092-PCT-MTL, 2020 WL 8416010, at *3 (D. Ariz. Jan. 9, 2020) (explaining that "'sanctions not only have a severe effect on the individual attorney sanctioned but also may deter future parties from pursuing colorable claims.'") (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 650 (9th Cir. 1997)).

In sum, given the extent of Crete's pre-filing investigation, along with the evidence Crete has since uncovered in discovery, and the seriousness of Rule 11 sanctions, I am persuaded that Rule 11 sanctions are not warranted.